Hear ye, hear ye, the Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Susan F. Hutchinson is on. Please be seated, everyone. Your Honor, the first cases on the docket this morning are 2-22-0230 and 2-22-0231. In the name of the American Theresa Lach, Petitioner, Appellant, and Appellant, and John Lach, Respondent, Appellant, and Appellant. Arguing for Theresa Lach, Mr. Michael Wiley. Arguing for John Lach, Mr. David Galbraith. Well, I understand that we have two appeals here. We've set some time limits, I believe, and hopefully I'll remember what they are. So if I don't, please don't be concerned. You remember. All right, Mr. Wyman, you may proceed. As I'm sure the panel appreciates, it's a pleasure to be before the court, counsel, for the record. In this matter, both parties have brought an appeal, but both parties appealed different aspects of the case. Our appeal solely relates to the order that was entered on a post-judgment basis that was entered in May of 2022. As it relates to the assets commonly known as MLL Inc., which are a Nevada corporation. Mr. Wyman, could you maybe pull that down just a bit? Is that better, Your Honor? It is for me. Okay, thank you. Our appeal solely relates to the disposition of MLL Inc. and the 71 parcels of property that are located in Pahrump, Nevada. I believe that our appeal and the statement of facts, in conjunction with the argument, lay out the relevant factors which occurred during the pendency of this 30-day trial in this matter. Mr. Wyman, why exactly did you file a motion in limine to prevent any evidence of value? Because no one had disclosed any evidence of any opinions of value. There had been multiple parcels of real estate for which appraisals had been obtained, those located in the state of Illinois, those located in the state of Colorado. The disparity we had and why this was done is we hadn't until less than two weeks before trial actually gotten an accounting of the actual properties or the inventory of assets that were owned by this. I thought there was something in the record that indicated Michael Latch was contacted and said he would be happy to meet an appraiser that was going to be sent by. I thought it was your client, but no appraiser ever showed up. I had no such communications with Michael Latch nor did anyone on behalf of Teresa Latch before he sat for his discovery deposition. And we didn't have the resources to engage an appraiser to appraise 71 parcels of real property. Well, how then, if there was a value set, were you going to, if there was, let's just say if there was, how would you have challenged that? Well, I would have been able to A, identify the properties and charge it. The bailiwick of all of this, Your Honor, Justice, was that we didn't even know what comprised of the assets of this entity. We had tax records and limited other records. But as the Court's well-praised, the law in Illinois is that both parties have a duty to present evidence of value. And when neither party presents evidence of value, the only alternative that the trial court has is to put it on the market and sell it. It can't describe a value. In fact, according to any testimony, I think it was Michael's, when he was talking about B parcels, he said they were different and they would sell for different prices and amounts. So how would you have been able, even if we sold the property, to know which ones were more valuable than the others and how they should be balanced out? But the Court would engage it at the Court's direction by whatever methodology would be appropriate. The Court choosing some agent who's identified in that marketplace. The Court directing the parties to try to reach an agreement and move the properties to sale. Did the parties try to reach an agreement as to valuation? Was there any attempt? Well, by all means, that's a product of the stipulation, Justice, is that there were numerous properties that the parties came to a stipulation of value on. As it related to the MLLA properties, there was no such stipulation. If you had tax information about those properties, I think that's what you just said, you could have identified those properties, which is exactly what Michael did. No, Your Honor, I couldn't do that because the tax information we had were the tax returns for MLLA, and those tax returns, which are part of the record on appeal, they were exhibits that were introduced into evidence, have no recitation, accounting, or detail of any of the properties at all. And you're right, all of these properties were unique and different, and no specific evidence was ever testified to or presented as to any specific value of any property. And the testimony was cumulative. The testimony was solely based upon hearsay. Now, didn't Michael present an exhibit during his deposition? No, Michael did not. What is the 154 that sets exhibit 154? I thought that was available at his deposition. No, exhibit 154 was prepared by him after his deposition. I take his deposition, I finally get him in from the State of Nevada the very end of January of 2020, trial is set for the second week of February. In the interim between his deposition and when the trial is supposed to start, there is an exchange of exhibits. The first time I see a listing, an accounting from Mr. Locke or tendered on behalf of Mr. Locke, is when the trial exhibits are exchanged, as was duly noted in the two-count motion in Liminate that I brought at trial. We had no knowledge of any specific addresses until that time, Your Honor. Counsel, did you seek a motion to continue or any other relief from the court on that basis, other than the motion in Liminate? We had already brought a motion to continue to try to complete discovery, and that had been done. As, Justice, I'm sure you're familiar, although you did sit on the first floor, adherence to Supreme Court Rule 218 is very important in the eyes of the Domestic Relations Division of the Circuit Court of Lake County, and this is a case that had already been continued twice. I remind you, it was a 2016 filing that was going to trial in February of 2020. So at that point, we had no choice other than to say all values should be barred, and the only fair and equitable means with which to manage the disposition of these 71 parcels of property and the related characteristics that went with it was to require their sale. That was the only equitable methodology to deal with it. You had conducted a cross-examination based on an exhibit that was apparently submitted to a bank in 2012. Yes, Meadows Bank. Right, the value there being 3.7 on these properties. That was the cumulative value that had been attested to under oath by Mr. Locke in October of 2012. Right, so you were aware of that valuation in advance. That was the only valuation we had in advance. Okay, so was it your intent or was it the purpose then at trial to present that as your evidence of valuation? You were just going to rest on that? No, our position throughout was that the properties were to be sold. The cumulative value of that exhibit had far greater weight on a multitude of fronts, but surely it was the one identifier that Mr. Locke had ever, ever given since the Court of Compensation. So let me just interrupt. So your goal was to force a sale of the properties to assess the value? The goal was to fairly and equitably divide the properties, and with an absence of information from Mr. Locke or any appraisals or any credible evidence, we had no alternative. What did you expect going in? How would the valuation have been determined by the Court when you were going in? You were going in on the 3.7 number. You were just going to rest on that? No, Judge, by no means. We didn't make any arguments that the fair market value of the properties were 3.7 and that they should be awarded to Mr. Locke. Our position concisely and continuously were the only way to deal with the disposition of these properties that are 2,000 miles away for which less than 10 days before we finally got a list of what the actual properties were. You knew about the properties before there was a disclosure? We knew. So why not hire an appraiser in Nevada? What efforts did Teresa take to get a valuation for those properties held by Yamaha? We didn't have the addresses to get the properties until 10 days before trial. Why didn't Teresa get trial? I'm sure the Court can appreciate because it's already acknowledged that each parcel is unique and separate and has many components that factor into value. And the cost was prohibitive and the financial resources weren't there. The common law record surely reflects that my client was working in a job, only having gotten back into the job market after being out for 17, 18 years, had no financial ability. Well, what was the $111,000 from the retirement account? I thought it was taken for attorneys' fees. It was taken in part to pay less than $20,000 for attorneys' fees. It was paid in gross-to-pay massive credit card bills that had amassed since Mr. Locke had cut her off in 2013. But Mr. Locke didn't stop paying expenses on the mortgages that were outstanding, especially on Whinstone or any of the other properties, did he? Mr. Locke did make payments on these properties that were under his sole disposition. But he made payments. You say he cut her off. He may not have given her, I don't know if there was an allowance at issue, but she did have credit cards and she did have her home paid for, the electricity paid for, things like that where she was living until she moved out in 2019? Yes. Okay. Well, let's go to another issue here, Sue. Sir, why exactly did you put your proposed judgment in your appendix? It wasn't filed with the court. We didn't realize until after it was brought to our attention that it wasn't part of the record. It was an inverted inclusion. Well, have you made any motion to this court to disregard it, or are you making it at this moment? I would make it at this moment, Judge. Thank you. All right. You may proceed. Counsel, one thing missing from the record is the closing arguments. They were in writing and they were submitted. I didn't find them. The record is 9,500-plus pages. Maybe it's in there somewhere, but I couldn't find it. My clerk could not locate it. I didn't refer to the closing arguments within my briefs, so I'm not certain, Judge, whether or not they're in the 9,500 pages. But my appeal goes to the accepting of value as to Mr. Locke's testimony. Mr. Locke, I believe, under the rule of law adopted by this court in the case of American National Bank and Trust Company v. City of North Chicago, adopts the Harper rule. And under the Harper rule, special circumstances exist. You have a property owner here who's never physically been to the properties, has no personal knowledge. The assumption under Illinois law that a homeowner has an innate ability to offer an opinion is based upon that being their homestead, them knowing the four corners of their property exist, how they face into the marketplace. And Mr. Locke's testimony was uncontroverted both in address examination and cross-examination, that he knows nothing of the properties to the extent of he couldn't give an exact number that he could pin himself down on as to the number of actual parcels that exist. Special circumstances should have been found by the court that Mr. Locke wasn't competent to testify and Mr. Locke hadn't disclosed his opinion as to this $470,000 cumulative value that he came up with to justify that. Okay. Did he actually testify to that number and the court accepted it or was it in some document or discovery that was tendered? He was allowed to testify in open court on it on July 20th of 2021. He testified that he used Zillow and Redfin to revalue the property. And his conversations with his brother and some tax information his brother had given him were all hearsay sources, all sources which should not have formed the basis and foundation for the admission of what is an opinion as to value, the only opinion of value. And I know that the trial court, when we were initially at trial in February of 2020, took the position with Michael Locke, you haven't disclosed an opinion of value, we're not going to allow the opinion of value to be allowed in at this point. And then as the common law record reflects, when we were back a year later, a year and a half later, and Mr. Locke was in his case in chief after we had rested, after everything had been completed from our perspective, he was allowed to say, I believe that it's $470,000. And as the record reflects, and I bring note of this, the court made no findings or rulings in the judgment as to value. It just identified the testimony of Mr. Locke. So the claim by John that we forfeited our arguments because we didn't bring them in the motion to reconsider, I don't believe is fair on its face. We didn't know. All we know is, yeah, paragraph 31 from the judgment, and then there's nothing else. And both parties acknowledged the trial court had failed to do that. Well, it says a stipulation occurred, I think, somewhere along the line that stipulated to the value. If it was not brought up in the motion to reconsider, wouldn't it be a fair then inference by the court that there was a stipulation? Well, no, I don't think at all it would be a fair inference because that didn't come out until the order on the motion to reconsider. That assertion that it was a stipulation was after the motions to reconsider had been filed in this manner. And it's an error. You can see that by no means was there a stipulation. Well, when the only evidence comes from John and you don't contest it, it's tantamount to a stipulation because you forfeited the argument. Well, you're right. I ask you to go back and repeat. I'm asking a question. Okay. Okay. That's not a fair characterization of what the trial court did. That's your point, right? The trial court said there's a stipulation. It was never a stipulation. He treated it as if it was a stipulation. I think that he didn't recall what had occurred in July when he was writing the judgment in February of 2022. There was clearly, I contested the admission of this. And it was at the end of one day, and then we came back the next day, and it was the first topic that came up. What was your argument in the motion to reconsider that addressed this point? That there was an absence of any findings or rulings and that the court needed to make findings or rulings relative to this. Counsel, what about if one party presents a value and another chooses not to, what does that say? I mean, typically, evaluation are competing expert opinions. You're right. I mean, you chose not to present a value. What effect do you think that had on the court's decision on the 470 assessment? Your Honor, we didn't choose to not present evidence of value. We were denied the ability to do that. When you don't have the base of an address of a parcel of real property until a week before trial, we were hamstrung. We had no ability to do that. That was Mr. Locke's plan. He didn't want us to know until the very end so that no one could do it, and he didn't get his own appraisal. There was no probative value evidence that was presented. The trial lasted a year and a half, right? So when you say you had no opportunity, you can still continue to research or hire an expert while the case is still pending and get permission from the court to provide a late disclosure given the circumstances. I don't think that that's a fair characterization of the events, Judge. You know, we were operating as a trial in progress 12 days in on March 15th when COVID hit. We had no idea when we were coming back, how quickly we were coming back, what was going to happen. I'm sure this court was infinitely familiar with the unknowns that were going on. This court did not cancel a single oral argument. We were open for business throughout the pandemic. I don't mean to contest with the court. My point is that the case was pending in the trial court for a year and a half from the beginning of the trial until the judgment. Yes, and it was in person, and that's why it was protracted for so long because it was a reasonable position for Mr. and for them to put on their case via Zoom. So we tried, and we were at the court's doorstep as soon as possible to get in to finish this case. Mr. Please take note of two things. We were trying to contest this matter continuously. On the day before we suspended, I brought a motion to get a TRO to stop Mr. Locke from encumbering assets. After we came back in spring of 2021 and Mr. Locke had leaned up all the properties, I tried to bring in a motion to add third parties. I was zealously fighting on behalf of Mr. Locke in addition to moving to try to finish this in-person trial as expediently as possible. And to finish, we didn't have the money. I didn't have the resources available to go hire an appraiser in the state of Nevada and say, get me 71 appraisals. Mr. Did you ask for attorney's fees from Judge Lombardo? I surely did. And what happened? The court's judgment was that each party pay their own attorney's fees. But did you, there is that level, the playing field of statutory. Did you ask at that at some point during trial that you needed this information? And therefore you needed an appraiser and therefore you needed an advance on fees? No, because I was operating under the presumption when Michael Locke's opinion testimony was deemed unadmissible. And my objection was that the court was adopting a perspective that no opinions of value as to these properties were going to be let in. Based on that, and I relied on that. There are a lot of other things to discuss, but we'll wait and see if they come up after argument here. You'll have an opportunity to reply if you choose. Mr. Del Rey. Thank you. May it please the Court of Counsel. Good morning. David Del Rey on behalf of John Locke, who responded to Pelley and responded to Pellent. They cited the case that says you can't sit on your hands at trial, do nothing, have no evaluation, and then come and ask this trial court, the second district, to assign a value to a property. They waived that right, as your Honor said, Justice Hutchinson, because they forfeited in their motion to be considered. They didn't have to do a motion to be considered. That was completely voluntary. Well, Mr. Del Rey, there is, you know, in this record, which is illuminous, information that these properties were not identified until very close to trial. And I am sure, without looking at every line of discovery, that information was requested well in advance of January. And I agree, and I respectfully disagree with the characterization that it was disclosed on the eve of trial. Remember, in the record, you will see that starting in 2013, Mrs. Locke had seen a divorce attorney. She then went on a course of copying everything in John's office over years until she decided to file for divorce in May of 2016. Unequivocally, she had a list of properties, these properties, that I didn't have going into the trial. You might recall. You could have gotten them from Michael, because Michael was able to get them pulled together, at least a list of the properties and their appraised value, within a very short time. Absolutely. And he brought that list to his deposition. Unequivocally, he had that list. Unequivocally, he offered Mr. Wyman to go to Pahrump. He lives in California. He buys and sells the most property in Pahrump of anyone there to say, I'll help your appraiser. I will go with them to each and every property. And they did not take him up on that. And to your point, Your Honor, you said, did you ask for attorney's fees? They didn't have to. She cashed in $111,000 of retirement, which, by the way, from the record, she testified was used to pay attorney's fees and real estate appraisers. They had every piece of property in Illinois appraised, every one of them, through those funds that she cashed in, which we thought was dissipation. So to say that they didn't have an opportunity or they didn't know, remember, her brother-in-law, J.B., works for John Locke. He did most of the buying and selling in 06, 07, and 08. And he testified on their behalf. That brother-in-law is related to or is married to Mrs. Locke's sister? Correct. Works for John Locke, did all of the buying, sometimes even taking title in his own name at Pahrump, and then transferring title to MLL Inc. Now, they forfeited the argument, and I just want to be unequivocal on this because in their prayer for relief, on their motion to reconsider, all they asked for is to divide the properties 50-50 pursuant to paragraph 31 of the judgment for dissolution of marriage or in the finding section of the judgment, which states the value of all 71 remaining properties is approximately $470,000. They accept that, and they just said, please just split it 50-50, which the Shroud Court denied. Well, okay. Again, I, as counsel, and I will ask you, even if you split it 50-50, there is testimony that was accepted by the court from Michael that the properties are different. They're all residential. They're in the middle of the desert, which is a problem for me. I'm not living in the desert. But they have different characteristics. They have different aesthetic values. How can we just say, okay, you take the first 36 and you take the second 35 and come up with an equal value? I don't think you can, and that's why I think the Shroud Court awarded them 100 percent to John Locke in his motion to reconsider that he granted on our behalf, and the reason is, remember, MLL, by the way, they didn't subpoena MLL for any of the documents at any time in the four-and-a-half years leading up to trial or any time in the year-and-a-half of trial. But that is only 41 percent by Mike Locke, 51 percent by John Locke. Now, we thought our 213s that disclosed John would testify as to the opinion of MLL and the properties was good enough. The trial court agreed. We also thought our 213 with respect to Mike Locke was adequate enough, and the court respectfully disagreed with me. So they objected at every chance they could to get any value. And finally, I had John testify. I looked at the tax records. I talked to my brother. I looked at Redfin. I looked at Zillow. And here's what I think as a layperson, which we all know you're entitled to do, he is the 51 percent owner of the entity that owns all of these properties. He did a lot of the purchases and some of the sales. They sold 10 before when the market crashed in 2008. So respectfully, I think his opinion, the only opinion that we have, by the way, is accurate. And is that 470 figure his part of the MLL or the entire MLL? It's the entire properties. Because, remember, if you look at the record, they spent over $2 million on these properties. And then when the market crashed in 2008, they're worth the sand that Your Honor testified to. They're plots of land in sand in Pahrump. And so, remember, the agreement between MLL, Mike and John Locke, is that Mike Locke, it's the first 49 percent of any net profit, of which I submit there isn't going to be any. But that's why I believe the trial court said, you know what, I'm just going to give this to John Locke because it's a heck of a lot easier than having Teresa Locke, even if I divided him in kind, 35 each or 35 and 36, to be a business partner with her former brother-in-law. So that's why we believe that the court allocated the property correctly because what he did in the original judgment, and now I'm going to kind of transition into our brief, if I might, if there's no further questions. One final question on that issue. You mentioned the 213s. What did the 213s say that John would testify to? To the value of all property bought and sold. Generally, I can't quote it, I don't have it with me, but the court found that it was sufficient enough for him to give a layperson's opinion. What we wrote about Mike Locke, I didn't write enough, quite frankly, for the court to feel that they were put on notice, which was a little surprising to me, that he would testify to the value because they had no one, no one, despite all the appraisals that they did in the state of Illinois, to testify to the value of the land at Pahrump. Well, you know, John Locke testified that he's never been to Nevada, and maybe he hasn't or maybe he's been to Nevada but not Pahrump. As a person who, as a layperson, you can testify to the value of your property, but you have to know something about it. What did he know about this property? Well, certainly he bought all of them during the marriage in 2006, 2007, 2008, and then he sold several of them, so he knew exactly what the price point was, right? He knew what the taxes were. He knew what the insurance cost to insure the properties, and he knew what he was selling the properties for when they were actually making money because, believe it or not, they did for several years. Then when the market crashed in 2008, you couldn't sell them for anywhere close to what they bought, and to me, that sort of opinion is enough to get a value for something that has not been appraised, frankly, by either party. But for them to come in here and say we didn't have the money, they got $111,000. They literally said in the record it was for attorney's fees and appraisers. So I think that should fall on deaf ears. Counsel, it's the dissipation, right? That's your next argument. For sure. So they're saying it should actually be more like $2.6 million based on the date. How do we assess what the court decided as to the irretrievable breakdown? I don't necessarily disagree with the finding that the irretrievable breakdown began in 2015. You'll see in their first claim of dissipation, which was filed prior to the trial started, said no later than 1-1 of 2012. I asked Teresa on cross-examination, where did you come up with that date? She said I had to pick a date. So the testimony was basically that the marriage was, they were working on it. Even in her petition for dissolution of marriage, she sent a letter to John saying I don't want this, I want to work things out. But I don't necessarily disagree with the 2015. What I disagree with is how the court computed the dissipation. Now, they filed an amended notice of dissipation on the eve of trial, three days before trial. I filed a motion to bar and a motion to eliminate. Because I don't think it complied with 503 at all. It didn't identify the specifics, but the trial court disagreed with me. So I go into trial three days. They list certain loans, some of which the court found were bonafide. They didn't list the specific loan that the trial court found was dissipation, the second $600,000 loan by Mike Locke to John Locke, which was taken over two installments, $300,000 in 2015 and $300,000 in 2016. Now, mind you, this is at a time when John Locke has not worked through testimony at both parties since at least 2005. He finished his last condo conversion in 2005. Teresa Locke hadn't worked since the 90s. Nobody was working. The court made a finding that all of the properties were current at the date that the trial commenced. Everything, 5315, 4611 Clark, 5 Lakeview, both the home, the lot, the properties in Colorado. How was that done? It was done by borrowing substantial funds from his family, his parents, and his brother. To say, you know, look, the classic definition, and look, it's a little dated, but it's, you know, dissipation. He's spending things on wine, women, and song. That is not this case. This case was supporting the family, maintaining their lifestyle, putting three kids, K-12 through private school, two children through U of I, maintaining a lifestyle where they could vacation in Colorado, and candidly, with all borrowed funds. But those borrowed funds helped both parties, not just John. Had John not borrowed, when we started the trial, there would have been nothing to actually argue about. Everything would have been in foreclosure. So my point was, we had an exhibit where John looked at all of the yearly expenses. Is that exhibit 163? 163, that's exactly right. 163, which is in the record of E981, is John taking a look at all of the expenses on an annual basis, and they show that it's anywhere from $350,000 to $400,000 to just run this household, from someone who hasn't earned any actual income, anything, since at least 2008. Apparently the judge found it wasn't specific enough, or what would they say? He let in the year 2016. He didn't let in some other years because it was, I think we didn't have enough statements. But 2016 is in the record, and that was one year, and that was about $360,000. And then John testified that every year thereafter it was about the same, even a little bit more relative to how much it cost to run the household. So I don't think that was dissipation when we're funding a lifestyle that they both enjoyed. And this is, again, prior to her even filing for dissolution at that point. And to your Honor's point, even when she got a job in 2015 as a server at Windstone, she wasn't contributing anything. She was keeping those funds, whatever they may have been. And she didn't actually start working full-time at a job that earned her $50,000 or $55,000 until 2018 and 2019. She didn't move out of the marital residence until 2019. John was still paying for everything. You could put that in quotes, paying for everything by borrowing money. He borrowed money from family and friends, the jealous. You might have seen that in the record. $380,000 from your friends just to borrow. What about the court's finding that John was not credible in relation to the loans? Well, listen, I respectfully disagree with that because he found some of the loans legitimate and some not. And we have a history of John. This isn't a loan taken to reduce the equity in a marital property because someone filed for divorce. This was a pattern from the 1990s before he ever even got married to Teresa. We proved he took 14 loans and repaid them all back. I think the judge found 10. I think respectfully it was about 14. The last one that Teresa was aware of, according to her testimony, was one in 2001 that she actually signed from John's parents for $325,000. These numbers sound enormous, right? But this was kind of their pattern and practice for all of these years. Is that one paid back or is that one still outstanding? That one was paid back. That one was paid back. What is still outstanding? So the way that the – a lot. I know, but I just – $1.5 million. The way – look, and I just want to be crystal clear. We are not disputing the allocation of the actual properties. What we're disputing is the fact that he awarded Teresa 4611 Clark, 5 Lakeview, the lot on Lake Zurich, with some land and a boathouse. And then the other one was his condo in Waukegan. Sorry, her condo. Her condo. What we're disputing is the $1.6 million in loans on those properties that some – this isn't even institutional. This is just the family loans that he's saying John has to pay. John has to pay and defray any reasonable cost, and that gets into the attorney's fees and indemnification issue. So he has to pay 100% of the merit of debt, all of the loans that he took, and Teresa doesn't have to pay anything in addition to getting 100% of all of the retirement. So all we're saying is make her responsible for those loans, whether they're institutional or otherwise. She'll do just what anyone else would do. Well, try and modify it. Try and work with the lender, whoever that might be. Maybe you have to sell the property. Does she need 4611 Clark, an industrial warehouse in the city? So that's where we disagree with what the trial court did. In the indemnification, the court indicated it was essential to enforcing it because there had already been litigation. There was no foreclosure action from John's parents on one of the properties. So what's your position on that? I mean, the indemnification, is it limited to indemnifying against lawsuits from family members, or is it – does it go beyond that? I think it goes beyond that, actually, because 5 Lakeview has institutional notes on it. I think it's PNC. We both asked in our motion to reconsider, hey, Judge, you kind of forgot about this particular loan. It was about $380,000 or so at the time. Please make Teresa refinance property. It's in John's name. She was awarded the property. I think we asked for 90 days. They even asked for 180 days, and that was ignored in the supplemental judgment. But to your point, Justice, I think it's indemnification for absolutely everything. Now, look, John's getting foreclosed upon, too. It's not John and Teresa. It's them getting foreclosed upon together. But to say that he has to – there's only three ways in the IMDMA where you can get attorney's fees. Now, we already know that Judge Lombardo said each are paying your own under the contribution 503J that they actually filed at trial. Nothing, by the way, during the four years of dependency of the case under 501. 501, 508, and 503J. But indemnity goes beyond attorney fees, right? Yes. So let's set aside attorney fees and assume that attorney fees are to be paid by whoever the parties are. Isn't it a reasonable remedy for the court to order indemnity as to potential losses on the properties, given the circumstances with the family? I disagree because even if you made her pay the 1.6, John is still at almost $3 million that he has to pay back. Look, indemnity, hold honorables, those two words, they don't exist in the IMDMA. There's no statutory authority for what the trial court did. It's not pretty. Their situation isn't pretty. We do that – well, not we, but the trial court does that all the time, and parties agree to that all the time. That on assets that are transferred, you know, we'll hold you harmless for that amount of money. Justice, I 100% agree with part of what you said. Every case that I file regarding indemnification comes from an agreement. It comes from two parties agreeing. I don't think the trial court has the authority to order indemnification. And I cited some cases that say, listen, you can't do that because there's not even judgment enforcement happening at the time. Indemnification happens once something essentially bad happens to the one party. Now, I understand what the trial court was trying to do. Don't get me wrong. Meet both parties with something, given the set of facts that it was, you know, the hand that the court had to deal with. But it's just not equitable. In fact, I think it's unconscionable to have John pay that $1.6 million for property that he wasn't awarded. There's one other dissipation issue that I wanted to look at, and that's Marlock. Yes. The money that's being transferred during that period maybe starts in 2008. Whether the court found this agreement in 2010 indefensible or whatever the word was, the money is still being transferred way before 2015. How exactly do we get back into that money for purposes of dissipation? Well, I don't think you do, and that's why I think that was also errored. So you know the record, Your Honor. In 2008, the Rocks, Ron and Pam, loaned John $500,000 to finish 5315 Ravenswood. Then the recession hit, and John said, I'm not going to use it for that. I can't do that right now. He literally is testimony. I asked my father. I had an investment opportunity with some friends in Florida. Mr. Rock wanted nothing to do with it. They earmarked $250,000. Now, again, this is in 2010. This agreement that you're speaking of, Exhibit 53 at the record, E500, is from June of 2010, six years before Teresa ever filed for dissolution. Now, unfortunately, what I call just a business deal that unfortunately didn't close for eight years, it closed during the marriage. We disclosed it. It closed for $2.6 million. John's share and Ron's share was a third pursuant to their agreement. And pursuant to their agreement, because it took more than six years, John only got 10% and Ron Locke got 90%. But when you look at, if you don't think it's a business deal and you think it might be dissipation, which I disagree with, you look at the fact that it was $860,000 that they actually, their third, which the court forgot about the cost basis. It was $350,000. So then you're on $500,000. Of course, you divide dissipation in two. That actual number is actually $255,000 if you feel it's dissipation, and we don't. They said in law school there would be no math. You're hurting my head. Sorry. But the fact remains that even if the court used the 2012 date that was suggested by Mrs. Locke, I had to pick a date, this transaction of the funds being lent and then the funds being used was even before that date. I agree with you. That's why I don't see it as dissipation. Counsel, two other points. One, I mean, John, according to Teresa, got the majority of assets. And then there's also the allegation that 63 Hilburn was encumbered during the trial. Do you want to address both of those arguments, please? Yes. So John was awarded 63 Hilburn, if I'm correct, and it's his responsibility to negotiate whatever lien is on that. And your first point, Your Honor, was? The majority of the assets went to John. Well, when you look at how the court allocated the debt attendant to those assets, yes, it's unconscionable. Looking at just the assets, we don't dispute the fact that she got 4611 Clark, 5 Lakeview, and E101, and John got a property in Colorado, the Merrill residence, which was underwater, and 5315. But he's responsible for not only all the debt attendant to those properties but all the debt attendant, institutional and otherwise, that she was awarded. And therein lies the unconscionability, in my humble opinion. All right. I think you have an opportunity to come back again. Five minutes, I'm told. Thank you. But at this point, your time is up. Good morning again. With relation to the reply in support of our appeal, the only thing I want to note is this, is that paragraph 31 is clearly unambiguous. The court made no findings under the judgment as to the value of MLL Inc. or any of the properties. The dispositive sentences, John testified that his opinion as to the value of all 71 remaining properties is approximately $470,000. A lay opinion, a lay opinion from under the Harper rule, where no one has contact, no connection, no ability to identify by property, is not an acceptable opinion of value under the rule of law. With regards to the balance of the judgment and the appeal that is brought by Mr. Locke, I trust that this court appreciates the financial destruction which has occurred here at Mr. Locke's hand. The court just brought up this lot on Hilburn. It's the only property that my client had title to. Everything that has occurred here has been the creation of Mr. Locke. The court clearly found that Mr. Locke had no justifiable explanation for not producing income when he had been an income earner for the gross majority of the marriage, that he had no explanation for his refusal to economize and the waste he created. But in terms of that, we often see the failure to work during the course of the divorce or start when the divorce starts and then goes forward. This failure to work, or as I think the judge put it, something like they, while they both were serially unemployed or something of that nature, that occurred way before the divorce started. Mr. Locke was never employed by a third party during the course of the entire marriage, and that's the context I think you have to view this in. There are lots of people who do their own business persons, and during this entire time, he's borrowing money, he's selling property, he's paying it back, he's borrowing money. He paid back about 10, counsel says 14 loans. I didn't count them, but the court looks like it looked at 10 major loans repaid during the course of his work. But you have to look at the timeline of the marriage. Those loans were all in the first 10 years. There was uncontroverted testimony from Ron Locke and John Locke that from 2002 until 2017, there were no family loans. If you look at that point in time, August 1st of 2015, a date after the court has found the irritable breakdown period has begun, there are zero family loans other than what I want the court to really take a look at. There's this handwritten note, not prepared in the ordinary course of business, no attorneys involved, that the $500,000 from two innocuous checks in 2008 is now a $250,000 loan and a $250,000 investment. In an entity that the court found, Mr. Locke clearly, Marlack, had the financial ability to put his own money in. The evidence was presented. He had more than enough cash on hand, and he did do that. And he was the operating member throughout it. He was a K1 holder throughout it. He was the one operating it. So he's working. He is working. You're right. You're showing that's the plan Mickey. He's owning and operating Marlack. For you to say he's not working when the growth of Marlack was so substantial really defies logic. Mr. Locke is responsible for that. You can look at the events in 2010, 2011, 2012. He's buying strip shopping centers with his brother in Nevada that he gave up his interest in, which he no longer has, in the Humahuaca and the Basin Row property. He's developing and flipping this condo in Avon, Colorado. He's doing things. He was doing things within the real estate world that he was accustomed to doing. And at the same time, if I may, according to that Exhibit 163, I think, certain expenses, including the mortgage on the marital residence, is being paid. The taxes on the marital residence is being paid. I'm assuming since they're living there, there's electrical, there's maybe the three children who are on social media, there's some sort of Internet cost, there's gas, there's electricity, there's phone. So you're saying he dissipated all of that money as opposed to paying those bills? He's getting money from real properties. He's getting money from his brother from the strip shopping centers. He's getting rental income from the Wakanda properties. The dissipation needs to be viewed through this lens. It's two big things. It's the $600,000 he took for his brother in 2015, after the irretrievable break-up period, because less than 30 days after his brother gets $650,000 from him. That was a calculated divorce planning plan. I'm going to take $300,000 from you now and $300,000 in the future because he knew he was getting ready for divorce. And the court assigned him that debt. Did you ask his brother in deposition or trial whether he had the $600,000 on hand because he's doing other business too, or he only had $300,000 and $300,000 to pay? I didn't have to ask that because all of the evidence was that that loan was made in August of 2015. In July of 2015, they sell the Avon property. John gets zero. He gives $650,000 to his brother less than 30 days before. So you're making an assumption that he had the money and he could have just paid it all back, but because of this divorce they went $300,000, $300,000. It was a plan by Mr. Locke. He's anticipating, I'm going to be borrowing money from you. I'm not, because this is all part of my game plan. He's been borrowing money since 1998. With all due respect, Justice, if you pin this out, these family loans, the first family loan after August 1st, there is no family loan. There's this alleged $600,000 that becomes $650,000 on the Avon condominium after Mr. Locke already purchases it with cash and puts none of that $600,000 into the property. But no, the record is clear that between 2002 and 2015, no money is borrowed, no debts are owed to the family members. This massive amount of debt that he's taken from his family is all part of his divorce strategy, so she gets nothing. Did you ever ask the amounts of money that were paid to Mike and Cindy during these periods of time? Because there are allegations that the senior Locke's would also give money to Mike and would give money, I think it's to Cindy. I think the testimony was complete that all the money comes from the Locke family trust that was founded in 2001, of which Jack is a beneficiary, and of which there's no evidence that the trust itself loaned money to anyone. There's a presumption under Illinois law that transactions undertaken between parents and children, especially within a domestic relations case, are to be viewed with skepticism. Did you argue this in the trial court? At great length. I think that that was the root cause of this judge finding. Can you identify where, in the pages? I think it was in my opening statement. Well, if it was in your closing statement, we don't have them, but you're sure it was in your opening statement. And you presented proof of that. Yes, Judge. I presented proof through the testimony of Ron Locke and Michael Locke and John Locke as to the culpable and sham transactions they conducted because they want her to have nothing. Right now, you asked about the litigation that's pending. There's a court appearance today on the foreclosure suit brought by Michael Locke against the 4611 Clark Street property. There's pending in the Chancery Division of Lake County a counterclaim for foreclosure against the Lake Zurich property against Michael Locke and Lambertucci Roma. They're going after her. This indemnification is make or break. If this indemnification is not upheld, she will get nothing but the retirement money. That's it. From a man who back in 2012 under oath said his net worth was in excess of $12 million, who said in 2012 under oath he was making more than $330,000 a year, and who represented under oath at that time, that he didn't include the two other properties, the Marlock and the Avon property that are gone, and every one of those other real properties that he put in that financial affidavit from 2012 that he gave to Meadows Bank, he still owns today. All right. Since those lawsuits have been filed and there is no dispute about the disposition or the division of these real properties, apparently that's by agreement or it became some way, has Mrs. Locke made any effort to refinance anything or take any action in the actual foreclosures? She has. We've appeared in both cases. Are we working with the lenders in any way? Yes, I'm moving to consolidate them in the divorce case because they won't communicate with me right now because they say we don't have standing or Mr. Locke has standing because he was the mortgager and he's the title holder. Okay. All right. Any questions? Just anything? No. Justice Brickett? Thank you. Thank you very much, Mr. Wyman. And Mr. Del Ray, anything in five minutes? I don't think I'll take that much. I do want to object. A lot of that was so far outside of the record in reality. But in any event, I just want to say thank you. But the things probably outside of the record are the lawsuits that have been filed and that it's expected. If those mortgages exist there and they're not being paid, this is not a big deal. We knew that that was going to happen. Understood. So let's go to something else. So I do want to just finish up with our final issue that was presented on our appeal, which is whether or not the trial court abused its discretion in dismissing John's petition for adjudication of indirect criminal contempt. Because I would be remiss if I didn't have an opportunity to tell you. You can't get a sense of what actually happened by reading the petition. But what we do know is that there was a subpoena that was issued to Wells Fargo in the state of California that Wells Fargo unequivocally responded to saying, you're not entitled to these documents. And that was in November of 2019. On the eve of trial, by the way, the responsive letter was not tendered to me. That subpoena was. On the eve of trial, a second subpoena was not tendered to me, pursuant to local rules and Supreme Court rules. And what are we looking for in those subpoenas? Third-party records? Yes. Or Mr. John Locke's records? Third-party records. Every document attended to the Ron and Pam Family Trust. Okay. So they didn't get noticed either. These third parties didn't get noticed. I didn't get noticed. How many pages allegedly were tendered from the subpoena? Thousands. Did you receive? How many of those did you receive? Zero until Judge Lombardo ordered them. They're in the middle of the trial. When I started seeing documents being presented to my client that I had never seen before. So I never had a chance. Not only was the subpoena completely fraudulent, Wells Fargo did respond. They say in the letter they induced the bank, in violation of Illinois banking rules, they induced the bank to comply when the bank had already complied. They told them in the letter, you didn't comply. And they did. They tendered the documents. Because the letter asked, get us these in two days. We sent you the subpoena four months ago. There's some issue about the mail, because Mrs. Locke was living at the property during some of this time. Could the notices have been sent directly to Mr. John Locke in the mail? No, no. Counsel is obligated to give me notice of subpoenas. Period. He knows my address. If Wells Fargo wrote letters and didn't receive any responses because the mail had been intercepted, is that a possibility here? Wells Fargo would have sent a letter to Pam and Ron Locke in the state of California saying somebody's trying to get your records, let us know what you want to do. Not to John Locke. But he was a beneficiary of that trust. He is a beneficiary of a revocable trust, yes. And that's the family trust. That's correct. Are Mike and Cindy also? As far as I'm aware. Okay. So just to finish up, these documents were that I said, where did these come from? And I'm paraphrasing, but I quoted in a petition for adjudication of indirect and direct criminal contempt. Mr. Wyman says unequivocally on day one when I bring it up, I tendered those to Mr. Del Rey. No proof of service. He was ordered to tender. I then ordered the record. The next day, he says I tendered them. I mean, it's unequivocal that he was making false statements to the tribunal. And it is imperative as litigants in this justice system that that can't happen. Now, look, maybe the court thought it was better well placed under a 219 motion for sanctions. I feel differently. But certainly there was probable cause. We took it to the state's attorney. We followed all the steps pursuant to our local rule, offered them to prosecute it. They declined. I asked the court to appoint a special prosecutor. It was declined. But speaking of mail judge, the only attorney's fees that were ever reported in this case were to John Locke because Mrs. Locke and her lawyer, after she had been out of the house for two years, went to the Barrington Post Office. She put a stop on his mail. Put a stop on his mail. Then went and collected all of them, presumably looking for accounts complicit with her lawyer. They went together. And that's when the trial court awarded fees and sanctioned her, $1,500. It didn't seem to do anything, this petition for indirect criminal contempt that I found, which seemingly is a relatively important petition, because just months later they're stealing his mail and getting sanctioned for it. Did the trial court make a finding of probable cause at any point? No, never. Not even denying probable cause, which I suppose I could have lived with if I had some rationales and findings on why it wasn't indirect or direct criminal contempt for it. And that's all I have. If there's no further questions. Thank you so much. Mr. Wyman, I'm going to give you, in my discretion, five minutes to address this issue of the subpoena because I wanted to ask questions about that, and it didn't come up until just this moment. Go ahead. Well, I noted in your reply brief you really don't talk about any of the allegations. You don't address any of the transcripts that's in Mr. Del Rey's. It's just that, well, we needed the records. Let me be clear. We issued subpoenas during the pendency of the case. There's no question that I spoke in error to the trial court on maybe the first or second day of trial relative to this, the underlying records. The subpoena had been issued back in October. There was no objection filed by anyone. Well, then who did you send notice to? Mr. Del Rey is the attorney at record. All right, but this was to the Locke. It was the Locke Family Trust. It was to Wells Fargo for the records of the Locke Family Trust. Well, you must understand, through discovery, Ron Locke and John Locke had tendered a wealth of other documents regarding the same account because the loans they were claiming were being made were coming from this account. They had opened the door, and they had made a disclosure of a wealth of transactional documents and statements for the account. I think you're sidestepping the issue. I don't mean to. Respond to the argument that you did not comply with local rule and also that the trial court never made a finding on the petition for indirect criminal contempt. We did disclose the subpoena. There's no question about it that my associate at the time Where in the record is there evidence that you disclosed the subpoena to? I don't know the record, but I know this, and I can speak to it, is that I advised the court that I had got the records, and I immediately that day gave them the records, and I didn't seek to introduce any of the records into evidence at the hearing on it. There is no question that the same subpoena We never got any response from Wells Fargo. There's no evidence at all that we received any response from Wells Fargo. Not even in local Illinois? Didn't you receive something? We had served a subpoena upon the California office for Wells Fargo. We got no response at all. On the eve of trial, we recognized that we didn't have that. I directed my associate at the time to enforce the subpoena, find out where are the records. He contacted them. They said that you needed to issue a subpoena to the Illinois branch, not to the California branch. And did you do that? He did that. I was not aware of that. I didn't participate in that at all. Well, he's your associate, so it's in your office. Did that notice go to Mr. Del Rey? There was no notice of that subpoena that went to Mr. Del Rey, Your Honor. There's no question about it. And that subpoena was issued, I believe, the week before trial, when discovery was still open, which I think belies the arguments that the timeliness of the notice of intent to claim dissipation under 503 was still open. The purpose of notice is to give the opposing party or parties an opportunity to contest the subpoena. For example, under the Illinois Banking Act, the privacy clause, they were entitled to notice. And this was the exact same subpoena that had been issued back in October, which they acknowledged they had noticed, and nobody made an objection to that. But maybe if nobody got notice of the second one to Illinois, they didn't know it was issued, so they could not object. I appreciate that, and that's why we didn't move to admit any of the documents or records that we had, because I acknowledged immediately as an officer of the court that we had made an administrative error and that for the second subpoena, we had not given the notice on the eve of trial. There was no doubt about it. And we tendered the records, and we didn't seek to use them in any form or fashion.  Every statement we received. Some place I read 1,491 documents. Were that many tendered? They were not part of the record. I have no specific recollection. I don't know the number, Judge, but I know as a body of documents, the requested information, we put them on notice in October, and we didn't seek to use any of that. But you also didn't really respond in your reply brief, to the best of my recollection. You didn't tell us these things in that reply brief. I didn't. Well, no, I didn't say those things in the reply brief, because I had, you're right, but clearly I didn't know they were going to change this. Because had you done that, you could have referred us to the pages in the record, the 9,000-plus pages in this record, so that we could look at it ourselves. Do you understand why I'm asking? I don't have an obligation to piece through this record to find out what you're now saying. I needed to know the page numbers, and that could have been accomplished in your brief. You're right, Judge. Thank you. Thank you. All right. Thank you, gentlemen, for your arguments this morning. We will take the matter under advisement. We're going to stand in recess now. We will be about 10 minutes, so the next oral argument will be delayed, and we apologize, but we've been sitting here, so please do whatever you have to do in those 10 minutes, and we'll be back. Thank you.